UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 09-13-GFVT-02 |
| V. | ) | |
| DWAUNE GRAVELY, a/k/a DEUCE, | ) | **MEMORANDUM OPINION** |
| | ) | **AND** |
| Defendant. | ) | **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Dwaune Gravely stands charged with the murder of a fellow inmate, Shamoni Peterson, at the United States Penitentiary, Big Sandy in Martin County, Kentucky. Absent the granting of his Motion to Dismiss Indictment[1] [R. 60], Gravely will defend against this charge without the benefit of most, but not all, of the surveillance video taken outside the cell during the time period when the murder took place. An unknown officer of the Bureau of Prisons ("BOP") failed to preserve this evidence which the government concedes shows a variety of violations of BOP policy.

The question before the Court is whether requiring Gravely to defend the murder charge without the video evidence violates his constitutional right to due process. And, then, if the answer is no, should the evidence of BOP policy violations be precluded as irrelevant and prejudicial. For the reasons set forth below, the Court finds no Constitutional violation or reason

---

[1] Gravely moves to adopt by reference a similar motion [R. 68] filed by co-defendant Darryl Marcus Milburne. [R. 106.] Since filing the motion, Milburne entered a guilty plea to one of the offenses charged and has been sentenced. The Court will grant Gravely's motion to adopt Milburne's motion and therefore attribute to Gravely the arguments raised by Milburne.

to categorically preclude the evidence of BOP wrongdoing.

## I.

Shamoni Peterson was found dead in cell D-240 in the Special Housing Unit ("SHU") on November 13, 2006. [Milburne's Br., R. 68 at 1.] Peterson had been transferred to that cell from another unit the day before. [*See id*.] At the time of his transfer and death, the cell was also occupied by Darone Crawford, Darryl Marcus Milburne, and Dwaune Gravely. [*Id*.] Big Sandy's Special Investigation Services ("SIS") opened an investigation into the death the same day. In the course of the investigation, investigators discovered razor blades in the cell and on Peterson's person. [*Id*. at 1-2.] Milburne apparently suffered lacerations on his arms consistent with razor blade cuts. [*Id*. at 2.]

In the days and weeks that followed, allegations arose of misconduct by Big Sandy officials in connection with the placement of Peterson in the cell and the hours surrounding his death. In one fashion or another, inmates are said to have told investigators and senior Big Sandy officials that prior to Peterson's placement in cell D-240, corrections officers knew he belonged to a rival gang of Gravely, Milburne, and Crawford's and had personally quarreled with these inmates. [*Id*. at 2-3.] One inmate, Eddie Pierre, recounted how officers had previously solicited his assistance in assaulting Peterson because of problems Peterson had caused for the officers. [*Id*. at 3.] Pierre claimed that during the assault in cell D-240, a corrections officer observed the fight and smiled. [*Id*.] Other inmates claimed to have alerted Big Sandy staff of the altercation in cell D-240 as it occurred and were ignored. [*Id*. at 3-4.] Inmate Patrick Howell claims he observed a prison guard collect clothing and other evidence in two trash bags and remove them from the cell to be destroyed. [*Id*. at 4.] Because of the

2

foregoing, the inmates believed that officers intentionally placed Peterson in the cell so that he would be assaulted and possibly killed. Gravely, raising these allegations of BOP wrongdoing in his Motion to Dismiss and in several pro se filings, also claims that he pushed the duress button from the cell during the fight between Milburne and Peterson. [R. 72; R. 148.]

The allegations of misconduct led to additional investigations by the Bureau of Prisons After-Action Team and the U.S. Department of Justice Office of the Inspector General ("OIG"). [R. 70 at 2.] The OIG's investigation was led by Special Agent Patrick Schumacker [*Id.*] and commenced on November 30. [R. 68 at 1.] In the course of its investigation, OIG staff interviewed inmates and Big Sandy staff, including the warden. [R. 70 at 2-3; R. 64 at 2; R. 68 at 5.] The OIG, the warden, SIS, and the After-Action Team reviewed prison video of SHU corridors from November 12 and 13. [R. 70; R. 64 at 2; R. 68 at 5.] The OIG ultimately concluded that Big Sandy personnel did not intentionally place Peterson in the defendants' cell with the purpose of initiating a fight, ignore the fight while it was ongoing, or intentionally destroy evidence of the fight. [R. 68 at 5.] It also found inmate Pierre's allegations to be not credible. [R. 70 at 3.] Nevertheless, the OIG did conclude that officers had been negligent and derelict in their duties [R. 68 at 5] and referred several potential administrative violations to the BOP for further action. [R. 70 at 3.]

On March 19, 2009, a federal grand jury returned an indictment charging Milburne and Gravely with conspiracy to commit murder, murder, and assault of inmate Peterson.[2] [R. 1.] Inmate Crawford was not charged in connection to Peterson's death. During discovery, Gravely

---

[2] The Indictment also charged both defendants with two other offenses, but those offenses have been dismissed by a previous Order of the Court. [*See* R. 66.]

sought video footage of SHU corridors from November 12 and 13. SHU corridors, but not the cells themselves, are recorded by video cameras. [*Id*. at 1.] The images captured on camera are transmitted into a VICON Kollector, a device containing six hard-drives designed for recording the camera images. [R. 143 at 2.] A Kollector's hard-drives hold a minimum of 14 days of recorded activities before reaching capacity, and once filled to capacity, the Kollector overwrites the oldest images. [*Id*. at 4.] Thus, to preserve footage captured on the Kollectors, the footage must be transferred to a CD. Selecting, downloading, and recording images to a CD is the function of SIS officers. [*Id*. at 5.] The process of saving footage begins with an SIS officer pulling up the footage from the Kollector's hard-drive. Next, the SIS officer views the footage from the Kollector and determines which portions should be saved. The officer then transfers the selected footage to a computer tower located in the SIS office. From the computer tower, the footage is saved to a CD. [*Id*. at 5, 6.]

For reasons that are unclear, the majority of the footage in this case was not preserved. The entire video footage would have lasted roughly 19 hours– from the time Peterson was let into the cell until he was carried out dead. [*Id*. at 7.] Only 27 minutes of the footage survives. Because surveillance footage is saved on the prison's hard-drive for only 15 to 30 days, the remainder of the footage was overwritten. [*Id*.] Of the two portions of footage saved and provided to defense counsel, the first runs more than twenty minutes long. [R. 64 at 2.] It depicts corrections officers placing Peterson in the cell. [*Id*.] The second portion, about three minutes in length, shows prison staff collecting a garbage bag from the defendants' cell. [*Id*.]

Several people viewed the entire footage before it was overwritten. Warden Suzanne Hastings, members of the SIS, members of the After-Action Team, and Special Agent

4

Schumacker reviewed the footage before it was erased. [R. 178 at 36-37, Transcript of Evidentiary Hearing.] Both Agent Schumacker and Warden Hastings made time lines of the events based on the entire footage. [R. 68 at 5; R. 143-1.] Their time lines do not corroborate Gravely's allegations. According to the United States, Agent Schumacker asked the BOP's After-Action Team to preserve any surveillance video reviewed. [R. 70 at 2.] For reasons that are not clear, his request was not acted upon. [*Id*. at 2-3.] Gravely claims that failure to preserve the entire surveillance video violates his constitutional right to due process and therefore requires dismissal of the charges against him.

## II.

To safeguard the right of criminal defendants to present a complete defense, the Supreme Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). Under this rubric, the failure to preserve materially exculpatory evidence violates due process regardless of the good or bad faith of the government. *Moldowan v. City of Warren*, 578 F.3d 351, 384-85 (6th Cir. 2009); *United States v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001) (citing *Trombetta*, 467 U.S. at 489). By contrast, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). In such circumstances– where the evidence is only "potentially useful"– the failure to preserve such evidence violates due process only when done in bad faith. *Wright*, 260 F.3d at 571 (citing *Youngblood*, 488 U.S. at 57-58). Therefore, in

5

order for Gravely to succeed in establishing that the BOP's failure to preserve the entirety of the video constituted a due process violation, he must show either 1) that the video was materially exculpatory or 2) that the evidence was potentially useful and that the government failed to preserve the video in bad faith.

**A.**

First, is the surveillance video of the SHU corridor constitutionally material under *Trombetta*? To meet this standard, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Wright*, 260 F.3d at 570-71 (citing *Youngblood*, 488 U.S. at 57-58). Neither requirement has been met.

Gravely's attorneys argue that the video contains exculpatory evidence because it would show that BOP officials were involved in the murder. [R. 68; R. 60.] While the Court finds the allegations against the BOP troubling, the exculpatory value of the evidence is far from apparent. Assuming the allegations are true, the Court fails to see how this exculpates Gravely. How does BOP guilt exonerate him? What Gravely claims the video would show (i.e. BOP officials bribing Peterson to enter the cell, looking into the cell during the murder and laughing, and helping the inmates get rid of the evidence), while certainly inculpatory of the BOP, is not automatically exculpatory as to Gravely. The most the alleged evidence shows, described most pejoratively, is that officials at the BOP are also guilty of conspiring to murder Peterson.

In *Brady v. State of Maryland*, 373 U.S. 83 (1963), the Supreme Court held that suppression by the prosecution of evidence favorable to a defendant upon request violates due process when the evidence is "material either to guilt or to punishment." *Id.* at 87. The

6

prosecution has a duty to turn over evidence which, if made available, "would tend to exculpate" the accused or reduce the penalty. *Id.* at 87-88. In *United States v. Agurs,* 427 U.S. 97, 112 (1976), the Court held that the prosecution has a constitutional duty to turn over evidence that "would raise a reasonable doubt about the defendant's guilt." These definitions of "exculpatory" do not fit the facts here.

In this Circuit, due process violations for the government's failure to disclose exculpatory evidence have been recognized in cases where the evidence tended to show that the defendant was innocent. In *Elkins v. Summit County, Ohio,* 615 F.3d 671 (2010), for example, the defendant was charged with the rape and murder of Judy Johnson. During the investigation, another individual asked the police, "Why don't you charge me with the Judy Johnson murder?" *Id.* at 673. The Sixth Circuit agreed that the statement was exculpatory because it would tend to prove that the defendant was not guilty. Evidence that the BOP was involved in orchestrating Peterson's murder would not "tend to exculpate" or "tend to disprove the guilt of" the defendant. Therefore, the Motion to Dismiss, on its face does not explain how the evidence, assuming the evidence is as Gravely alleges, is exculpatory.

In two pro se filings, however, Gravely alleges that the video would actually prove his innocence. [*See* R. 72 and R. 148.] Specifically, he claims that the video would show that he pressed the duress button and "notified staff that Peterson needed assistance." [*Id.*] Judges often refuse to consider a represented defendant's pro se filings because a defendant does not have a right to both represent himself and be represented by counsel. *See United States v. Degroat*, No. 97-CR-20004-DT-1, 2009 WL 891699 (March 31, 2009 E.D. Mich.). The Sixth Circuit has held that district courts are "not required to consider the defendant's pro se filings when represented

7

by counsel." *United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987). There is support, however, for a court's considering a represented defendant's pro se filings "out of an abundance of caution" or "in exceptional circumstances." *See United States v. Jenkins,* 229 Fed. Appx. 362 (6th Cir. 2005); *Hill v. Carlton*, No. 08-5373, 2010 WL 3272800, at *5 (August 19, 2010 6th Cir.). In this case, the Court will consider Gravely's pro se filings by treating his factual assertions as statements. The Court will not, however, consider Gravely's legal arguments.

Hypothetically, if the video footage showed that Gravely pressed the duress button during Peterson's murder, such footage may have exculpatory value. In reality, however, the surveillance footage would not have indicated if a duress button was pushed from inside the cell because there is no outward signal that a duress button has been pushed and because the cameras do not reach inside the cell. [R. 178 at 29-35, Transcript of Evidentiary Hearing.] According to the United States, when a duress alarm is activated, it must be reset. [*Id*. at 35.] To reset the duress alarm, an officer uses a key from outside the cell. [*Id*.] There is no independent evidence to suggest that the duress alarm in cell D-240 had to be reset. [*Id*.] Furthermore, even if the video could show that a duress button was pushed, it would be impossible to determine whether the duress button was pushed by Gravely or by the victim. [*Id*. at 53.] Therefore, the exculpatory value of the evidence, even if it is as Gravely alleges, is minimal at best.[3]

Next, Gravely must show that the exculpatory value of the video was apparent to BOP

---

[3] The Supreme Court has held that the government also has a duty to disclose impeachment evidence. *United States v. Bagley,* 473 U.S. 682, 676 (1985). The government has a duty to turn over evidence that would impeach the credibility of its witnesses, but only if the witness' credibility is material to guilt or innocence. *United States v. Giglio*, 405 U.S. 154 (1972)*.* Impeachment evidence is material to guilt, and thus the failure to disclose it requires a new trial, if "there was a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Bagley,* 473 at 682. For the reasons discussed above, the defense has failed to show that the evidence in this case meets those standards.

officials before the video was overwritten. Determining whether the exculpatory value was apparent to the BOP is a difficult task because the government claims that the video had no exculpatory value at all. When evidence is destroyed, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Trombetta*, 467 U.S. at 486. Therefore, in applying this test, Courts ask, "what is the chance that the evidence would prove to be exculpatory?" *See Trombetta,* 467 U.S. at 489 (applying this prong and stating that although the missing evidence might have contributed to the defense, "chances are extremely low that [the destroyed evidence] would have been exculpatory"); *Elmore v. Foltz,* 768 F.2d 773, 777-78 (6th Cir. 1985) ("[T]he chances that the [destroyed evidence] would have proved exculpatory are negligible. Other than the conflicting testimony of [the defendant and the government], the only evidence about the contents of the [destroyed evidence] was the report of Officer Fogarty, who monitored the [live events] as they occurred. His report supports [the government's] version of the events."); *Ford v. Seabold*, 841 F.2d 677, 693 (6th Cir. 1988) ("[A]lthough the preservation of [the destroyed evidence] might have contributed to Ford's defense, the possibility that [the destroyed evidence] could have led to Ford's exculpation would have been extremely slim."). In other words, there is no due process violation when the destroyed evidence is only "of speculative exculpatory value." *United States v. Jobson,* 102 F.3d 214, 219 (6th Cir. 1996). The evidence is "of speculative exculpatory value" when the defendant does not put forth sufficient evidence to prove the evidence would show what he says it would show. *See id.* at 219; *Elmore*, 768 F.2d at 778.

In the case at hand, the claimed value of the video is speculative. First, even if Gravely's allegations are true, it is far from certain that the surveillance camera would have recorded

evidence to prove his allegations. The surveillance footage has no audio component, no capability to see inside the cell, and no way to detect when a duress button is being pushed. Second, Gravely, who bears the burden of proof, has not put forth sufficient evidence to support his allegations. The only independent evidence he has offered to support the Motion to Dismiss is his word that inmates will corroborate his allegations of BOP complicity in the murder.

The majority of the evidence before the Court supports the United States' position that the video did not contain exculpatory evidence. The warden reviewed the entire video, and her time line does not confirm Gravely's allegations. The After-Action Review, made up of BOP officials from different states, concluded that Gravely's allegations were not well founded. Even more persuasive, the OIG– an entity of the Department of Justice independent from the BOP– reviewed the full version of the video, and concluded that there was no foul play on the part of BOP personnel. Neither the OIG's time line nor the warden's time line confirm Gravely's assertion that he pressed the duress button. In fact, Gravely has offered no independent evidence to support the assertion that this event occurred. He does indicate that he may call a BOP official who will testify that he remembers a duress alarm, but no affidavits have been provided to the Court, and it remains to be seen if this BOP official will in fact testify at trial. [R. 178 at 38-39, Transcript of Evidentiary Hearing.] In light of the foregoing, at most Gravely has shown a mere possibility that the lost footage could be favorable to his defense. This is not sufficient to satisfy the requirement that the exculpatory value of the evidence be apparent to the police before its destruction. *Youngblood*, 488 U.S. at 56 n. *; *Jobson*, 102 F.3d at 219 (6th Cir. 1996).

The final factor for analyzing whether the evidence was materially exculpatory under *Trombetta* is whether the defendant is able to obtain comparable evidence by other reasonably

available means. Here, Gravely does have access to comparable evidence by reasonably available means. He has the OIG report, which details the interviews of several Big Sandy officials, including those, such as the warden, who reviewed the entire video. Gravely also has two independently made time lines made from the entire footage that may prove useful in proving BOP complicity or impeaching government witnesses. The OIG's time line, for example, contains several notations indicating that guards looked into the cell after the murder, and a notation indicating that an orderly made a "throat slashing" motion when looking into the cell. Gravely also has the two portions of footage saved to a CD, which contain evidence of BOP officials carrying trash bags out of the cell. Additionally, Gravely has identified a BOP official he claims will corroborate his allegation that a duress button was pushed from inside the cell. This evidence, potentially harmful to the United States, constitutes "other evidence" that Gravely may be able use at trial, consistent with the Rules of Evidence.

Gravely has also identified inmates who claim to have observed first-hand the incidents he alleges transpired on tape. If necessary to his defense, Gravely is free to call these inmates to ascertain what occurred outside cell D-240 on November 12 and 13. Finally, Gravely may also testify himself and impeach the testimony of BOP officers who deny his allegations. Collectively, these sources provide sufficient evidentiary alternatives to the video footage. *See United States v. Parker*, 72 F.3d 1444, 1452 (10th Cir. 1995) (defendant had access to comparable evidence of video recording of traffic stop because he could have testified or called witnesses to testify about the events recorded); *United States v. Brimage*, 115 F.3d 73 (1st Cir. 1997) (finding no due process violation even when the "other evidence" available to the defense was the testimony of defendants who would have to waive their fifth amendment right not to

testify).

Gravely cites *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) for the proposition that testimony about lost evidence may be an inadequate alternative for the evidence itself. [R. 68 at 7.] *Cooper*, however, involved circumstances of quite a different nature than this case. There, the government destroyed equipment that it claimed was used by the defendant to manufacture methamphetamine. *Cooper*, 983 F.2d at 930. The defendant argued that the equipment was configured to manufacture lawful products. *Id.* In response to the government's suggestion that Cooper could question experts familiar with properties of lab equipment or its designer, the court found that "General testimony about the possible nature of the destroyed equipment would be an inadequate substitute for testimony informed by its examination." *Id.* at 932. In other words, the proposed witnesses lacked any familiarity with the specific equipment in question and could testify only about examples. Here, by contrast, witnesses either observed the events in the SHU corridor first-hand or saw the entire video footage. They therefore have a familiarity with the events that the prospective *Cooper* witnesses lacked.

Gravely also contends that inmate testimony is not comparable to video footage because inmates are subject to credibility challenges. The mere fact that a defendant is left with inferior evidence does not create a due process violation. *See Elmore v. Foltz*, 768 F.2d 773, 778 (6th Cir. 1985) (due process not violated by destruction of audio tapes of drug transaction despite the fact that "no better tool exists for impeaching" the adverse witness than the tapes). "Under *Trombetta* [] all that matters is that some reasonable alternative exists for attempting to do what one would have attempted to do with the destroyed evidence." *Id.* For these reasons, the Court finds that Gravely has access to other comparable evidence. Because Gravely has not proven

that the exculpatory value of the footage was apparent to the BOP when the footage was overwritten, and because he has access to comparable evidence, he has failed to prove a due process violation under *California v. Trombetta*, 467 U.S. 479 (1984) .

**B.**

Next, assuming that the video evidence is at most "potentially useful to the defense," did the government act in bad faith? This is the question required by *Arizona v. Youngblood,* 488 U.S. 51 (1988) (destruction of evidence that is "potentially useful to the defense" violates due process only if the defendant can prove that the government destroyed the evidence in bad faith). "'The presence or absence of bad faith by the police for the purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time is was destroyed.'" *Jobson*, 102 F.3d at 218 (quoting *Youngblood*, 488 U.S. at 56-57 n. *). "To establish bad faith, then, a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Id.* (quoting *Trombetta*, 467 U.S. at 488). Government negligence and even gross negligence in failing to preserve evidence is insufficient to establish bad faith. *Id.*

Bad faith is especially difficult to determine when the events surrounding the loss of evidence are unclear. Here, the Court is disturbed by the fact that, despite repeated requests from Gravely, the government is unable to disclose the name or names of individuals responsible for failing to preserve the entire surveillance video.[4] This makes determining bad faith even

---

[4] The United States asserts that it has made a good faith effort to determine who is responsible for the decision by interviewing anyone at the BOP who would have had the authority to make the subjective determination. [R. 178 at 14-20, 36, Transcript of Evidentiary Hearing.] Their efforts, however, have been fruitless, as "memories have faded" with time. [R. 143.]

more difficult because the person responsible for the destruction of evidence cannot be questioned. To help with the difficult determination of bad faith, courts have settled on numerous factors. Those factors include: whether the government was placed on notice that the defendant believed the evidence was exculpatory; whether the defendant's assertion that the evidence contained potentially exculpatory material was merely conclusory or supported by independent evidence; whether the evidence was in the government's possession when destroyed; whether the evidence is central to the government's case; and whether the government offered a reasonable explanation for the destruction. *United States v. Bohl,* 25 F.3d 904 (10th Cir. 1994).

Applying these factors to the case at hand, there are several facts that give the Court pause. For one, the evidence was in government possession when it was lost. Second, the government was put on notice that the video was believed exculpatory when inmate Howell sent a letter, dated November 18, alleging BOP complicity in the murder and requesting that the video be preserved. [R. 68 at 4.] Additionally, the OIG instructed the BOP to preserve the entire surveillance video, but BOP officials ignored that request. Additionally, the Court does not find the government's explanation for the video's destruction entirely persuasive. Bad faith is usually absent when evidence is destroyed in accordance with standard procedures concerning the disposal of evidence. *See United States v. Gibson,* 963 F.2d 708, 711 (5th Cir 1992). The government concedes that at the time the video was reviewed there was no policy or procedure for preservation in place. [R. 178 at 6-7, 20-21, 25-26, Transcript of Evidentiary Hearing.] Consequently, the facts in this case do not support a finding that the evidence was destroyed in accordance with a standard procedure.

The United States goes in to great detail regarding the fact that surveillance footage, captured on the VICON Kollector, is always overwritten after a period of time. [R. 143.] According to the government, if not saved to a CD, surveillance footage is lost forever once overwritten. [*Id*.] Therefore, someone is tasked with the responsibility of viewing the footage and saving relevant portions to a CD. Here, the problem was not that the footage was automatically overwritten before anyone had a chance to save it to a CD, but rather that someone made the decision only to save select portions of the footage.

The entire video footage would have lasted roughly 19 hours– from the time Peterson was placed into the cell until he was carried out dead– had it been saved in total. Instead of saving the entire video, or even footage taken during the time the murder was believed to occur, someone at the BOP saved a mere 27 minutes of footage. The Court is not persuaded that it is the routine practice of the BOP/SIS to save only a very small percentage of video footage recorded during a brutal murder, even taking into account the possibility that video of the hallway may not have shown much activity. Even though the defense can point to no official BOP policy that was violated by the failure to preserve more of the video, the Court finds that the failure to preserve the video rises to the level of gross negligence.

Other factors, however, demonstrate that bad faith is not present here. As mentioned above, the contents and exculpatory value of the missing video remain speculative at best, a relevant factor in determining the existence of bad faith. Without independent evidence that the video captured the events alleged by Gravely, the Court is reluctant to attribute bad faith to the government. There is also some evidence that the government made an honest effort to preserve evidence that it believed relevant to the investigation. The BOP saved one portion of the video

that is arguably the most damning: a clip that shows a corrections officer removing a trash bag from Gravely's cell. This incident may corroborate some of the allegations raised by Gravely and other inmates. In addition, the United States alleges that an agent from the OIG, an entity of the Department of Justice independent from the BOP, will testify "that he saw no bad faith on behalf of BOP personnel regarding what not to record to CD." [R. 143 at 10.] Finally, the events that transpired in the corridor are not essential to the government's case against Gravely. This suggests that the BOP did not destroy the footage as a "conscious effort to suppress exculpatory evidence." *Jobson,* 102 F.3d at 218.

In light of the foregoing, and considering that the burden of proving bad faith rests with the defense, the Court finds that there is not enough evidence to prove that the government acted with "official animus" towards Gravely or with a "conscious effort to suppress exculpatory evidence."[5] *Jobson*, 102 F.3d at 218 (quoting *Trombetta*, 467 U.S. at 488). The Court does find that destruction of the video constitutes gross negligence, but gross negligence is not enough to establish bad faith. *Jobson*, 102 F.3d at 218. Because Gravely has failed to satisfy *Trombetta* and *Youngblood,* the Court will deny the Motion to Dismiss.

---

[5] The Court recognizes that under *Jobson*, in addition to the government's bad faith, the defendant must show that the exculpatory value of the evidence was apparent before its destruction; and that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Jobson*, 102 F.3d at 218. This brings us full circle to the test set out in *Trombetta*, as the *Jobson* opinion seems to make the two tests indistinguishable. This merging of the two tests has been criticized by at least one member of the Sixth Circuit. *See United States v. Wright*, 260 F.3d 568, 572-574 (6th Cir. 2001) (Judge Gilman concurring with the outcome but pointing out the misapplication of *Youngblood* in *Jobson*). Since the Court has already determined that the video lacks apparent exculpatory value and that Gravely had access to comparable alternative evidence, the *Youngblood* test, even as interpreted in *Jobson,* is met.

**III.**

Although the investigations of the SIS, the After-Action Team, and the OIG do not confirm Gravely's allegations (either that he pushed the duress button or that BOP staff were involved in Peterson's death), the investigations uncovered numerous staff violations of BOP policies and procedures on November 12 and 13, 2006. [R. 147.] Some of the violations include failure to search trash removed from the cell, failure to require inmates to stand during count, failure to complete rounds in a timely fashion, and failure to cuff an inmate when the cell door was opened. [*Id.*] The United States seeks to exclude evidence of these violations, arguing that the violations in no way "contributed to or caused the death of Peterson." [*Id*. at 3.]

Gravely, however, intends to use the evidence to prove just that. His theory is that the BOP and Milburne are responsible for Gravely's death. [R. 178 at 61, 63-64, Transcript of Evidentiary Hearing.] Evidence that someone else is responsible for a crime, instead of the defendant, is directly relevant to guilt or innocence and likely admissible at trial. Ultimately, evidence that officials violated BOP policies and procedures may be relevant to impeach the testimony of government witnesses, depending on the specific evidence and the way in which it is used at trial. The Court is hesitant to restrict Gravely's access and use of "other evidence," especially when it is, in part, the availability of this "other evidence" that led the Court to find that the failure to preserve the entire surveillance video did not violate the defendant's due process rights. For these reasons, the Court will deny the Motion in Limine without prejudice to raise again in the context of trial.

**IV.**

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as

follows:

1. Defendant's Motion to Adopt Co-Defendant's Pleading by Reference [R. 106] is **GRANTED**;

2. Defendant's Motion to Dismiss Indictment [R. 60] is **DENIED**.

3. The United States' Motion in Limine [R. 147] is **DENIED WITHOUT PREJUDICE**.

This the 13th day of January, 2011.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge